UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

GREAT LAKES REINSURANCE
(UK) PLC,

     *Plaintiff,*                    CASE NO. 10-CIV-21138-JORDAN

       v.

OFELIA DIAZ and                  AFFIDAVIT IN SUPPORT OF
ALFONSO GONZALEZ,             PLAINTIFF'S MOTION FOR
                               SUMMARY JUDGMENT
     *Defendants*

_____/

COUNTY OF BROWARD         )
                        )   ss:
STATE OF FLORIDA          )

     B.A. Usher, being duly sworn, deposes and says:

    1.   My name is B.A. Usher, and I reside at 16A Newfield Drive, Menston, Leeds, West Yorkshire LS296 JQ in the United Kingdom.  Beginning in 1993, I was employed at T.L. Dallas, and then at T.L. Dallas (Special Risks) Ltd., ever since that company's formation in 1999. As Managing Director and Senior Underwriter for T.L. Dallas (Special Risks) Ltd., I was responsible for the entire department and for all personnel who were involved in the yacht & pleasure boat account, and the small commercial craft account, which the company wrote on behalf of Great Lakes Reinsurance (UK) plc during the time that Policy Nos. 200/658/76729, 200/658/99587, OSPYP/111379 and OSPYP/120618 were issued to Ofelia Diaz.

    2.   In 2008, the principals in Osprey Special Risks Ltd. acquired the interests of the T.L. Dallas Group in an amicable

1

buy-out and Osprey now functions as a new and independent entity which is the exclusive marine underwriting agency offering marine insurance policies on behalf of Great Lakes Reinsurance (UK) plc.

3.    My duties both at the present time with Osprey Special Risks Ltd., and also with T.L. Dallas (Special Risks) Ltd., included making the final determination as to whether and on what terms marine insurance coverage will be agreed to with respect to any particular risk that is submitted by a broker to T.L. Dallas (Special Risks) Ltd. However, at all times material hereto I have employed several individuals within the Underwriting Department whose role it is to assist me by handling Quote requests which are submitted by brokers acting on behalf of assureds, and by ultimately issuing the actual policies where the material facts as disclosed in the application materials make it quite clear that the particular risk being proposed falls squarely within the terms of a formal set of written underwriting and rating guidelines which I have prepared and provided to these individuals. Liam Gilhooly is an underwriting assistant who has been assisting me with these routine tasks since October 1, 2005. Neil Burton is another such underwriting assistant who has been assisting me since February 1, 2002. Matthew McLean is another such underwriting assistant who is no longer employed at Osprey Special Risks, having been so employed from June 18, 2001 until his departure August 14, 2009.

4.    I have inspected and I am quite familiar with the application materials which are contained in the Underwriting File

which we maintain here in Ilkley, which materials were provided to us via Houlder Insurance Services (Marine) and Ropner Insurance Services Ltd. The latter are both Lloyd's brokers specializing in placing marine insurance, which was involved in this particular risk. The offices of Houlder and Ropner are located in The City of London, in the United Kingdom. Certain materials found in our Underwriting Files pertaining to Ofelia Diaz were submitted directly us via Hull & Company, which was the Florida-based surplus lines broker acting on behalf of Ofelia Diaz.

5.    In order to prepare this sworn affidavit, I have also had occasion to read the transcripts of the recorded statements provided to Nautilus Investigations by Ofelia Diaz and Alfonso Gonzalez as part of the post-incident investigation, as well as the transcripts of the depositions that Ms. Diaz and Mr. Gonzalez gave on January 25, 2011. I have in addition read the transcripts of the deposition provided by Teri Saxon of Hull and Company and of Livia Pedraza Lakes & Country General Insurance.

6.    My affidavit is based upon my review of these documents and also upon my personal knowledge of our underwriting practices. It is also based upon my direct personal involvement in and my consequent first-hand knowledge and review of the insurance application documents submitted by or on behalf of Ms. Diaz and Mr. Gonzalez.

7.    At all times relevant hereto, T.L. Dallas (Special Risks) Ltd. was the authorized underwriting and claims handling agent for Great Lakes Reinsurance (UK) plc as regards Policy Nos.

3

200/658/76729, 200/658/99587, OSPYP/111379 and OSPYP/120618 were issued to Ofelia Diaz. As the authorized underwriting agent, T.L. Dallas (Special Risks) Ltd.'s role was to receive and to then evaluate applications for the marine insurance coverage that we were authorized to write.  T.L. Dallas (Special Risks) Ltd. would then either issue a quote to the surplus lines broker on the basis of the information contained in the application and any supporting materials, or else T.L. Dallas (Special Risks) Ltd. would refuse to issue a quote and would thereby reject an application for marine insurance coverage.

8.    Such applications would normally be forwarded to our offices via e-mail and telefax from the various surplus lines insurance brokers located all around the United States with which we had established business relationships. As noted, in the case of Ofelia Diaz, all direct communications were via Houlder or Ropner here in the UK, or else via Hull & Company in Fort Lauderdale. As a result of prior dealings, it was my understanding that Houlder and Ropner were in turn acting at the direction of Hull & Company, the Fort Lauderdale-based surplus lines broker.

9.    As one of the largest and busiest yacht and pleasure boat insurance facilities in the United Kingdom, offering marine insurance coverage with Great Lakes Reinsurance (UK) plc, amongst others, T.L. Dallas (Special Risks) Ltd. in 2006 and 2007 maintained relationships with as many as one hundred sixty-five (165) different surplus lines insurance brokers located throughout the United States.

4

10.   The role of these surplus lines insurance brokers is to submit to us applications and requests for quotations on prospective policies of marine insurance.  Since we have provided it to them, these brokers will have in their possession the policy language that our insurance policies will contain, and they will also have our application forms. The applications are completed sometimes with the assistance of the broker, and then via the broker are e-mailed or faxed to our facility in the United Kingdom for my review and underwriting decision.

11.   In this particular matter, near the end of May 2006 Paul Young, a broker employed at Houlder, e-mailed us an unsigned and only partially completed two (2) page application seeking a Quote for a marine insurance policy on a 2006 31 ft Sea Vee power vessel that was represented as having just been purchased by both Ofelia Diaz and Alfonso Gonzalez for $220,000.00. It was on the basis of the information disclosed in this unsigned and partially completed application, identifying Mr. Gonzalez as the prospective assured and owner/operator, and Ms. Diaz as his wife and the other owner, that T.L. Dallas (Special Risks) Ltd. made the initial decision as to whether or not we would respond with a quote for a particular type of policy, what that quote or premium will be, the type of policy that we might offer, and other terms.

12.   At the time of the submission of Ms. Diaz and Mr. Gonzalez's application and supporting materials, in May and June of 2006, T.L. Dallas (Special Risks) Ltd. had established and was

enjoying a relationship with Houlder Insurance Services (Marine) in which that London marine insurance broker was sending us a modest but regular flow of applications from individuals such as Diaz and Gonzalez.

13.   Houlder is a Lloyd's broker based in the UK and does not hold a Florida surplus lines broker license as would be required in order to broker marine insurance on behalf of Florida residents such as Diaz and Gonzalez. As noted, it was my understanding that Houlder was in turn acting at the direction of Hull & Company, a Fort Lauderdale-based broker which does have the requisite Florida surplus lines broker license.

14.   Although there was no reference to any other local broker on the unsigned and partially completed application that we first received, the later signed and fully completed application illustrated that indeed another broker, Seitlin Insurance, was also involved on behalf of Diaz and Gonzalez, being listed on the signed and completed application as the producer.

15.   Knowing that Hull & Company was the broker with the Florida surplus lines license, it was apparent that Seitlin was the marine insurance broker with which Diaz and Gonzalez had had direct or personal contact. With its office based in Miami, it was apparent to us that the broker at Seitlin had chosen to go to Hull & Company in order to have the latter's assistance in seeking a marine insurance policy from the UK Market.

16.   In the marine insurance industry, the local broker that has the direct or personal contact with an insured is referred to

as the "retail broker," while the broker that the latter goes to for assistance in approaching a particular source or market is referred to as the "wholesale broker." So in this situation, Seitlin was the retail broker that Diaz and Gonzalez dealt with directly, and then Seitlin in turn went to Hull & Company, which was therefore the wholesale broker. Although there was nothing to prevent Hull & Company from coming to us directly, since Hull & Company holds a Florida surplus lines license, they decided to utilize the services of Houlder in order to submit the application for a policy of marine insurance from Great Lakes Re.

17.   Neither Houlder Insurance Services (Marine) nor Hull & Company acted at any time as an agent for T.L. Dallas (Special Risks) Ltd., or for Osprey Special Risks Ltd. or for Great Lakes Reinsurance (UK) plc. Neither Houlder not Hull ever at any time had any authority to bind either T.L. Dallas (Special Risks) Ltd. or Osprey Special Risks Ltd. or any of the various marine insurance companies and/or underwriters on behalf of which T.L. Dallas (Special Risks) Ltd. and/or Osprey Special Risks Ltd. were authorized to act.

18.   No surplus lines broker is or ever has been authorized to bind either T.L. Dallas (Special Risks) Ltd., or Osprey Special Risks Ltd. or Great Lakes Reinsurance (UK) plc in any manner. Authority to bind on any prospective risk must come from T.L. Dallas (Special Risks) Ltd. or Osprey Special Risks Ltd. and this authority is transmitted to the insured's broker(s) only after we have reviewed and approved the application submissions which have

been provided to us by these entities.

19.   In this particular matter, an unsigned and partially application, seeking a marine insurance policy for Ofelia Diaz and Alfonso Gonzalez on their newly purchased 2006 31 ft Sea Vee power vessel alleged to have a value of $220,000.00, was submitted to us by Houlder Insurance Services (Marine). As stated above, Houlder worked with Hull & Company, a duly licensed surplus lines broker located in Fort Lauderdale and specializing in obtaining marine insurance coverage for other brokers such as Seitlin who were working on behalf of individual clients but who for one reason or another were unable to approach us directly or by themselves.

20.   There was never any agreement between T.L. Dallas (Special Risks) Ltd. and Houlder and/or Hull, beyond the agreement that these brokers could refer business to us if they chose to. Like every other broker, Houlder and/or Hull were completely free to approach any other markets with which they were doing business in an effort to obtain satisfactory or even superior terms for the insurance coverage being sought on behalf of their client.

21.   The only thing that Houlder and/or Hull were in fact authorized to do in the instant matter was to forward to T.L. Dallas (Special Risks) Ltd. a request for quotation, and to submit a fully completed application form and other supporting material. Such a document was indeed provided to us and review of the material information contained in the application bearing the signatures of both Ofelia Diaz and Alfonso Gonzalez resulted in the subsequent issuance of Policy No. 200/658/76729 with an

effective date of June 2, 2006.

22.   As noted, with respect to Hull & Company, other brokers working directly on behalf of individual insureds such as Ms. Diaz and Mr. Gonzalez would approach Hull & Company in order to obtain marine insurance for their clients. Going through Houlder, Hull & Company might then approach our marine insurance facility to seek insurance coverage, in precisely the same manner as any of the numerous other brokers for which T.L. Dallas (Special Risks) Ltd. constitutes a potential market.

23.   At no time, either prior to or since the submission of the application material that resulted in issuance of Policy No. 200/658/76729, has either T.L. Dallas (Special Risks) Ltd. or Great Lakes Reinsurance (UK) plc had any relationship whatsoever with Seitlin. Neither I nor any other individual at either T.L. Dallas (Special Risks) Ltd. or at Great Lakes Reinsurance (UK) plc has ever had any contact or communication, written or verbal, of a business or commercial nature with any individual employed by or in any manner associated with Seitlin. As the "retail broker" having the original contact or relationship with Diaz and Gonzalez, Seitlin would have had to go to Hull & Company and would have had to request the latter's services in order to obtain a marine insurance policy from T.L. Dallas (Special Risks) Ltd.

24.   As noted, our first communication regarding Diaz and Gonzalez came near the end of May 2006 when Houlder sent us the application form which appeared to be on behalf of Mr. Gonzalez. The London broker's goal was to obtain what is termed a Quote.

9

25.  A request for a Quote is an inquiry from a broker with regard to whether T.L. Dallas (Special Risks) Ltd. would be willing to offer a policy of marine insurance on behalf of Great Lakes Reinsurance (UK) plc, and if so, the most salient and basic terms for that policy and the premium that would be charged.

26.  Such Quotes were routinely solicited from T.L. Dallas (Special Risks) Ltd. by brokers using either partially completed application forms or their worksheets on which the broker has written down the material information obtained as a result of his communications with the prospective assured.

27.  The unsigned and partially completed application form submitted by Diaz and Gonzalez's brokers in late May 2006 was quite unremarkable. It indicated "Need Quote ASAP for insured to pick up boat;" that Alfonso Gonzalez was the prospective insured but that Ofelia Diaz was Gonzalez's wife and the other owner of the vessel, which in turn was described as a new 2006 31 ft Sea Vee power vessel, with a maximum speed of 45 mph, a purchase price and insured value of $220,000.00 which specifically included a trailer, and which was going to be operated in the waters of Florida and the Bahamas. Mr. Gonzalez was represented to us as possessing 7+ years of years of boat ownership.

28.  On the second page of the application a series of questions are presented for response by the prospective insured. Question No. 8 asked "Have you or any named operator been involved in a marine loss in the last 10 years (insured or not)?" That question was answered with a "NO."

29.  On May 31, 2006, Neil Burton at my direction sent a Quotation back to Paul Young via e-mail indicating the terms on which T.L. Dallas (Special Risks) Ltd. would agree to issue a Great Lakes Re marine insurance policy to Mr. Gonzalez. A premium in the amount of $6,355.00 was to be charged for the coverage, which was expressly noted as being subject a "satisfactory application form."

30.  On June 2, 2006, Paul Young sent an e-mail to Liam Gilhooly stating that Diaz and Gonzalez were seeking a revised Quote based on a hull value reduced from $220,000.00 to $200,000.00, lower limits for liability coverage and no coverage for loss of personal property. That same day, Mr. Gilhooly at my direction sent a revised Quotation back to Paul Young via e-mail indicating the amended terms on which T.L. Dallas (Special Risks) Ltd. would agree to issue a Great Lakes Re marine insurance policy to Mr. Gonzalez. A premium in the amount of $5,415.00 was to be charged for the coverage, which was once again expressly noted as being subject a "satisfactory application form."

31.  On June 5, 2006, Mr. Young at Houlder responded to the Quote sent by Mr. Gilhooly by sending us a request to bind the coverage at the premium of $5,415.00 along with a fully completed application identifying both Diaz and Gonzalez as insureds. The signed application was dated of June 2, 2006.

32.  The now fully completed application, signed by both Diaz and Gonzalez, provided what we took to be full disclosure of all the material facts with regard to the risk that was being

proposed. Satisfied with the disclosure and after reviewing and evaluating the risk, T.L. Dallas (Special Risks) Ltd. agreed to issue Great Lakes Re's marine insurance Policy No. 200/658/76729 affording coverage to both Alfonso Gonzalez and Ofelia Diaz for, *inter alia*, Hull & Machinery coverage on the 2006 31 ft Sea Vee including a trailer in the agreed amount of $200,000.00 for the period from June 2, 2006 through June 2, 2007.

33.   Just like the unsigned application that had been submitted by the brokers in order to elicit our Quotation, on the second page of the duly signed application there was that same series of questions presented for response by the prospective insured. Question No. 8 asked "Have you or any named operator been involved in a marine loss in the last 10 years (insured or not)?" Once again, that question was answered with a "NO." Again, the vessel's main mooring/storage location was represented as being 4950 S.W. 122nd Avenue, Miami, Florida 33175.

34.   On June 6, 2006, we received an e-mail from Paul Young of Houlder advising that the named insured on the policy should be Ofelia Diaz and that Alfonso Gonzalez would only going to be an the operator. Then on June 7, 2006 we received an e-mail from Mr. Young asking us to amend the binder to reduce the hull value from $200,000.00 down to $193,100.00 and to specifically insure the vessel's trailer for the sum of $6,900.00. We responded by informing him on June 14, 2006 that we could not issue a revised binder but had instead sent him two (2) endorsements which would afford the amendments to the policy which he had requested.

12

35.   On Endorsement No. 1 to Policy No. 200/658/76729 issued on June 14, 2006, Ofelia Diaz is listed as the named insured and the agreed insured value of the vessel is listed as $193,100.00. On Endorsement No. 2, Ofelia Diaz is again listed as the named insured and the trailer that was purchased along with the vessel is expressly noted as having been added to the policy at an insured value of $6,900.00.

36.   More than a full year later, on August 31, 2007, another broker at Houlder working with Paul Young sought a Quote for Ofelia Diaz and attached a completely new application, fully completed and signed by Ms. Diaz dated August 30, 2007. Whereas Seitlin had been disclosed as Diaz's retail broker on the previous year's application, this time it was Lakes & Country General Insurance which was disclosed on the new application. At no time, either prior to or since the submission of the application material that resulted in issuance of the succeeding years' policies has either T.L. Dallas (Special Risks) Ltd. or Great Lakes Reinsurance (UK) plc had any relationship whatsoever with Lakes & Country. Neither I nor any other individual at either T.L. Dallas (Special Risks) Ltd. or at Great Lakes Reinsurance (UK) plc has ever had any contact or communication, written or verbal, of a business or commercial nature with any individual employed by or in any manner associated with Lakes & Country. As the "retail broker" having the original contact or relationship with Diaz and Gonzalez, Lakes & Country would have had to go to Hull & Company and would have had to request the latter's services in order to

obtain a marine insurance policy from T.L. Dallas (Special Risks) Ltd.

37.    On the application bearing her signature and dated August 30, 2007, Ofelia Diaz represented her vessel as having a present value of $150,000.00. Without any explanation whatsoever, no coverage was sought for the trailer which had been the subject of Endorsement No. 2 to Policy No. 200/658/76729, with the term "EXCL." having been written in at the place on the application where information regarding the trailer would have been requested. The vessel's main mooring or storage location was represented as being the Marine Stadium Marina on Rickenbacker Causeway. Alfonso Gonzalez was disclosed as the sole operator, represented again as having 7+ years of experience in both the ownership and the operation of vessels. Just like the applications (both signed and unsigned) which had been submitted by the brokers in order to elicit our original Quotation and the first year's policy, appearing on the second page of the August 30, 2007 application were those same questions presented for response by the prospective insured. Question No. 8 once again asked "Have you or any named operator been involved in a marine loss in the last 10 years (insured or not)?" and once again, that question was answered with a "NO."

38.    On August 31, 2007, Matthew Mclean at my direction sent a Quotation back to Paul Young via e-mail indicating the terms on which T.L. Dallas (Special Risks) Ltd. would agree to issue another Great Lakes Re marine insurance policy to Ms. Diaz. A

premium in the amount of $3,955.00 was to be charged for the coverage, which once again was expressly noted as being subject a "satisfactory application form."

39.  On September 3, 2007, we received an e-mail from a broker at Houlder accepting the terms of our Quote and requesting that coverage be bound at a hull value of $180,000.00 rather than the $150,000.00 which had initially been indicated.

40.  The fully completed application signed by Diaz and dated August 30, 2007 provided what we took to be full disclosure of all the material facts with regard to the risk that was being proposed. Satisfied with the disclosure and after reviewing and evaluating the risk, and willing to accept the hull value of $180,000.00 since this had been supported by submission of a bill of sale, T.L. Dallas (Special Risks) Ltd. agreed to issue Great Lakes Re's marine insurance Policy No. 200/658/99587 affording coverage to Ofelia Diaz for, *inter alia*, Hull & Machinery coverage on the 2006 31 ft Sea Vee in the agreed amount of $180,000.00 for the period from August 31, 2007 through August 31, 2008. The policy afforded no coverage for a trailer, and the $4,440.00 premium that was charged was based at least in part on the representation made in the application dated August 30, 2007 that neither Ofelia Diaz not Alfonso Gonzalez had been involved in a marine loss in the last 10 years, whether insured or not.

41.  Near the end of the second year's policy, on July 2, 2008, Matthew Mclean sent out a Renewal Emailed Quotation specifying the terms on which we would agree to renew the previous

15

year's policy. On August 21, 2008, having moved from Houlder to Ropner, Paul Young responded by requesting renewal and by submitting two (2) documents which we required in order to renew the coverage on the vessel owned by Ofelia Diaz. These two (2) completed documents, termed a Renewal Questionnaire and Operator Details, were submitted via the UK-based broker on August 21, 2008 in order to obtain our renewal of the coverage which had been afforded under Policy No. 200/658/99587. The Renewal Questionnaire was signed by Ofelia Diaz and dated August 20, 2008.

42. The second document, termed Operator Details, specifically asked that same critical question which had previously appeared on the formal applications, the one which asked "Have you or any named operator been involved in a marine loss in the last 10 years (insured or not)?" Whereas previously that question had been answered with that question was answered with a "NO," this time Diaz and Gonzales responded with "N/A."

43. All of the previous years' completed application forms and the renewal documents provided what we took to be full disclosure of all the material facts with regard to the risk that was now being proposed for the third time. Satisfied with the disclosure and after reviewing and evaluating the risk, Osprey Special Risks Ltd. agreed to issue Great Lakes Re's marine insurance Policy No. OSPYP/111379 affording coverage to Ofelia Diaz for, *inter alia*, Hull & Machinery coverage on the 2006 31 ft Sea Vee in the agreed amount of $180,000.00 for the period from August 31, 2008 through August 31, 2009. The premium that was

16

charged for this policy was $4,200.00, and that figure was once again based at least in part on the representation made in the application dated August 30, 2007, and also in the August 20, 2008 renewal application forms, that neither Ofelia Diaz not Alfonso Gonzalez had been involved in a marine loss in the last 10 years, whether insured or not.

44. Near the end of the third year's policy, at some time in August 2009, the brokers acting on behalf of Ofelia Diaz once again submitted a fully completed Osprey Renewal Questionnaire form signed by Ofelia Diaz, with the date of August 21, 2009 right next to her signature. This always critical document which we required in order to yet again renew the coverage on the vessel owned by Ofelia Diaz asked yet again that same critical question which had previously appeared on the formal applications. On this final Osprey Renewal Questionnaire, signed by Diaz and dated August 21, 2009, the question is phrased in terms of each individual operator, and where the information for Alfonso Gonzalez appears the question "Have you ever been involved in a marine loss in the last 10 years (insured or not)? If YES please give details & amounts paid:" This question on the Osprey Renewal Questionnaire signed by Ofelia Diaz and dated August 21, 2009 was once again answered with a "NO."

45. The previous years' completed application forms and the renewal documents provided what we took to be full disclosure of all the material facts with regard to the risk that was being proposed. Satisfied with the disclosure and after reviewing and

17

evaluating the risk, Osprey Special Risks Ltd. agreed to issue Great Lakes Re's marine insurance Policy No. OSPYP/120618 affording coverage to Ofelia Diaz for, *inter alia*, Hull & Machinery coverage on the 2006 31 ft Sea Vee in the agreed amount of $180,000.00 for the period from August 31, 2009 through August 31, 2010. The premium that was charged was $4,190.00, based yet again at least in part on the representation made in the application dated August 30, 2007, and also in the various renewal application forms, that neither Ofelia Diaz not Alfonso Gonzalez had been involved in a marine loss in the last 10 years, whether insured or not.

46. Once again, the renewal documents submitted via the brokers indicated that there were no changes sought in the coverage. Accordingly, we then agreed to issue Great Lakes Re's Policy No. OSPYP/120618. That policy afforded the same coverage to Ms. Diaz for the period from August 16, 2009 through August 16, 2010 and this was the policy of marine insurance that was in effect when a claim was submitted for the alleged theft of the 2006 31 ft Sea Vee vessel represented as being owned by Ofelia Diaz.

47. Because the vessel owned by Ofelia Diaz was a fairly common type of pleasure craft, originally purchased new at the time of the first year's policy and with a hull value well within the parameters of our program, with proposed navigational limits falling squarely within the locations that our program routinely offered, with prospective operators evidencing what any reasonable

and intelligent marine underwriter would recognize as an adequate level of both ownership and operating experience, and where over the course of all four (4) years of coverage there was never any disclosure of any type of prior marine loss whatsoever, my underwriting assistants Messrs. Gilhooly, Mclean and Burton were in each instance and for each of the four (4) years of coverage permitted to deal on their own their own with the underwriting issues without any input or scrutiny from me. However, my underwriting assistants would have been required to bring this or any other risk to me for my own personal and independent underwriting evaluation only in the event that any application materials had disclosed any prior marine losses, that the vessel was capable of speed exceeding 70 mph, that any prior policy had been cancelled or non-renewed, or if the vessel was going to be engaged in any type of commercial activity.

48.   The 2006 31 ft Sea Vee vessel owned by Ofelia Diaz was reported to have been stolen on or about November 13, 2009. As is our routine practice, especially following submission of a claim in South Florida where the vessel has been reported stolen, a thorough investigation was carried out following the submission of this claim. As revealed for the first time in their recorded statements, and in their respective depositions, Ms. Diaz and Mr. Gonzalez had been involved in not one but two marine losses occurring during the term of the first year's policy, Policy No. 200/658/76729. The trailer which had been purchased with the vessel and which had been separately and specifically insured

under Policy No. 200/658/76729 for $6,900.00 had been stolen from the facility maintained by the Sea Vee dealer in Miami, while the vessel itself had been amongst several boats which had been vandalized during a May 5, 2006 break-in which occurred at the Marine Stadium where it was being stored.

49.   As noted, the application dated August 30, 2007 and signed by Ofelia Diaz, which had been submitted via the brokers acting for Diaz and Gonzalez in order to obtain Policy No. 200/658/99587, responded with a "NO" to the question seeking disclosure of prior marine losses. As also noted, the $4,440.00 premium that was calculated by my underwriting assistant was based at least in part on the representation made in the application dated August 30, 2007 that neither Ofelia Diaz not Alfonso Gonzalez had been involved in a marine loss in the last 10 years, whether insured or not. As further noted, my underwriting assistants were permitted to deal on their own with the underwriting issues without any input or scrutiny from me only where certain specified circumstances existed as revealed on the broker's request for a Quote. However, my underwriting assistants would always have been required to bring this or any other risk to me for my own personal and independent underwriting evaluation in the event that any application materials had disclosed any prior marine losses.

50.   Therefore, having reviewed all the documents in Underwriting Files for each of the four (4) years of coverage, it is absolutely clear that the non-disclosure of the theft of the

trailer and of the break-in at the marina impacted the premiums that were charged for the policies issued for each of the succeeding years. By concealing the events which had occurred during the initial policy year of June 2, 2006 through June 2, 2007 on the application signed by Diaz and dated August 30, 2007, Diaz and Gonzalez ensured that the premium that was Quoted by Matthew Mclean on August 31, 2007 and which was eventually charged for Policy No. 200/658/99587 was lower than it would have otherwise been.

51. Had there been disclosure on the August 30, 2007 application of either of the marine losses which came to light only in the post-claim investigation, my underwriting assistant would not have been allowed to deal with the proposed risk by himself, but would have been required to bring the application to me for my direct evaluation. Because there had been a theft of the very trailer which had been amongst the tangible items insured under Policy No. 200/658/76729 just the year before, had I been accorded the opportunity to make my own independent underwriting judgment with an application that had disclosed the trailer's theft, then I would have certainly been compelled to demand a higher premium than $4,440.00 for the issuance of Policy No. 200/658/99587.

52. My evaluation of the risk and the premium to be charged must absolutely be based on prior events, and regardless of the fact that the theft of the trailer took place while it was in possession of a third party, no responsible or intelligent marine

21

underwriter could possibly just ignore the fact that the theft had occurred when setting the next year's premium. Premiums are determined on a number of criteria, including the insured's experience, waters to be navigated, the type of vessel, etc. One of the primary criteria that any reasonable and prudent marine underwriter must also make reference to would be the insured's prior loss experience. Indeed, the reason we ask about prior marine losses is so we can reasonably and intelligently assess risk in the future on the basis of what has occurred in the past. Any marine loss, including the theft of the insured's vessel's previously insured trailer, must be taken into consideration by a marine underwriter and must result in a higher premium because such a prior marine loss has been disclosed.

53.  Had there been disclosure of the theft of the trailer, causing the application to be submitted to me for my own independent underwriting evaluation, I would have increased the $4,440.00 premium that my unsuspecting underwriting assistant charged for Policy No. 200/658/99587 by at least fifteen percent (15%). Had there been disclosure of the theft of the trailer, causing the application to be submitted to me for my own independent underwriting evaluation, the premium for Policy No. 200/658/99587 would have been $5,485.00. So just the non-disclosure of this one fact resulted in the premium for the second year's policy being lower than it otherwise would have been, and then the continuing non-disclosure in the succeeding years resulting in Policy No. OSPYP/111379 and Policy No. OSPYP/120618

both having been obtained for premiums lower than would have been the case had there been disclosure of the theft of the trailer.

54.   Had there been disclosure of the theft of the trailer, causing the application to be submitted to me for my own independent underwriting evaluation, I would have increased the $4,200.00 premium that my unsuspecting underwriting assistant charged for Policy No. OSPYP/111379 again by at least fifteen percent (15%). Had there been disclosure of the theft of the trailer, causing the application to be submitted to me for my own independent underwriting evaluation, the premium for Policy No. OSPYP/111379 would have been $5,410.00.

55.   Had there been disclosure of the theft of the trailer, causing the application to be submitted to me for my own independent underwriting evaluation, I would have increased the $4,190.00 premium that my unsuspecting underwriting assistant charged for Policy No. OSPYP/120618 again by at least fifteen percent (15%). Had there been disclosure of the theft of the trailer, causing the application to be submitted to me for my own independent underwriting evaluation, the premium for Policy No. OSPYP/120618 would have been $5,385.00.

56.   As noted, I have read both the transcript of the recorded statement which Mr. Gonzalez provided to Nautilus Investigations and also the transcript of his deposition, and I note that in his deposition he is insisting that the vessel suffered far less physical damage than he admitted to originally in his recorded statement, and that he is now insisting that he

did not pay any sum out of his own pocket in order to have the vessel repaired following the May 5, 2007 break-in. I have also read the sworn affidavit of Livia Pedraza dated October 29, 2010 in which she states that Ms. Diaz informed0 her with regard to the May 2007 breaking and entering incident at the marina and that "the only thing to happen to the subject vessel was the disconnection of the vessel's GPS."

57.   I am aware of the fact that Terri Saxon of Hull & Company has denied under oath that any such conversation with Ms. Pedraza ever took place. It is certain that neither I nor anybody else at TLD or Osprey was ever provided with any information whatsoever regarding the May 5, 2007 break in at the marinas where the insured vessel was being stored.

58.   The claim was originally denied based on the version which Mr. Gonzalez told Nautilus at his November 20, 2009 recorded statement, in which he described damage caused by the vandals requiring him to lay out between $7,000.00 and $8,000.00 for the cost of repairs for which he decided to not make a claim against Policy No. 200/658/76729. Disclosure of this version of events on the application dated August 30, 2007 would most certainly have caused my underwriting assistant to have brought that application to me, and most definitely would have caused me as a prudent, reasonable and intelligent marine underwriter to have increased the premium in order to reflect the fact of a prior marine loss. The reasons would be exactly the same as those presented, *supra*, in my recounting the impact of non-disclosure of the theft of the

24

vessel's trailer – while premiums are determined on a number of criteria, it is certain that one of the primary criteria that any reasonable and prudent marine underwriter must also make reference to would be the insured's prior loss experience. That is the reason that the question regarding prior marine losses is asked. Any marine loss, including the vandalizing of the insured vessel while at a marina, must be taken into consideration by a marine underwriter and must result in a higher premium because such a prior marine loss has been disclosed.

59. However, regardless of which version Mr. Gonzalez would have this Court believe, the fact remains that on May 5, 2007 there was a break-in at the marina where the insured vessel was being stored and that the 2006 31 ft Sea Vee vessel was on the receiving end of the attentions of the persons who broke in. The vessel was vandalized at least to some extent and disclosure should have been made. Disclosure of the incident of May 5, 2007 would have placed us on notice of a second incident occurring during the first year's policy period, whilst the insured vessel was in the custody of somebody other than the named insured or the operator.

60. I have already stated that had there been disclosure on the August 30, 2007 application of either of the marine losses which came to light only in the post-claim investigation, my underwriting assistant would not have been allowed to deal with the proposed risk by himself, but would have been required to bring the application to me for my direct evaluation. So, had I

been accorded the opportunity to make my own independent underwriting judgment with an application that had disclosed both the trailer's theft and also the bare fact that the vessel, too, had been vandalized as described by Gonzalez in his deposition, then I as a prudent and intelligent marine underwriter would have certainly been compelled to demand a higher premium than $4,440.00 for the issuance of Policy No. 200/658/99587.

61. Once again, it is the most basic and essential element of marine underwriting that the evaluation of the risk and the premium to be charged must absolutely be based on prior events, and regardless of the fact that the theft of the trailer and the vandalizing of the vessel itself took place while it was in the possession of third parties, no prudent or intelligent marine underwriter could possibly just ignore the fact that these two independent events had occurred when setting the next year's premium. Premiums are determined on a number of criteria, including the insured's experience, waters to be navigated, the type of vessel, etc. However, one of the primary criteria that any reasonable and prudent marine underwriter must also make reference to would be the insured's prior loss experience. As noted, the reason we ask about prior marine losses is so we can reasonably and intelligently assess risk in the future on the basis of what has occurred in the past. Any marine loss, including the theft of the insured's vessel's previously insured trailer and even the admittedly very minor vandalizing of the vessel while at a marina which Gonzalez testified to under oath and which Livia Pedraza

swears she passed on to the surplus lines broker, must be taken into consideration by a marine underwriter and must result in a higher premium because such prior marine losses have been disclosed.

62.   Had there been disclosure both of the theft of the trailer and the vandalizing of the vessel while at a marina which Gonzalez testified to under oath and which Livia Pedraza swears she passed on to the surplus lines broker, causing the application to be submitted to me for my own independent underwriting evaluation, I would have further increased the $4,440.00 premium that my unsuspecting underwriting assistant charged for Policy No. 200/658/99587. Had there been disclosure of both the theft of the trailer and the vandalizing of the vessel, causing the application to be submitted to me for my own independent underwriting evaluation, the premium for Policy No. 200/658/99587 would have been $5,745.00. Non-disclosure of these two facts resulted in the premium for the second year's policy being lower than it otherwise would have been, and then the continuing non-disclosure in the succeeding years resulting in Policy No. OSPYP/111379 and Policy No. OSPYP/120618 both having been obtained for premiums lower than would have been the case had there been disclosure of the theft of the trailer and the vandalizing of the vessel.

63.   Had there been disclosure both of the theft of the trailer and the vandalizing of the vessel as described in the Gonzalez deposition, causing the application to be submitted to me for my own independent underwriting evaluation, I would have agsin

even further increased the $4,200.00 premium that my unsuspecting underwriting assistant charged for Policy No. OSPYP/111379. Had there been disclosure both of the theft of the trailer and the vandalizing of the vessel, causing the application to be submitted to me for my own independent underwriting evaluation, the premium for Policy No. OSPYP/111379 would have been $5,670.00.

64. Had there been disclosure both of the theft of the trailer and the vandalizing of the vessel as described in the Gonzalez deposition, causing the application to be submitted to me for my own independent underwriting evaluation, I would once again have even further increased the $4,190.00 premium that my unsuspecting underwriting assistant charged for Policy No. OSPYP/120618. Had there been disclosure of both the theft of the trailer and the vandalizing of the vessel, causing the application to be submitted to me for my own independent underwriting evaluation, the premium for Policy No. OSPYP/120618 would have been $5,645.00.

65. Had Diaz disclosed on her August 30, 2007 application either or both of marine losses in which she and Gonzalez had been involved during the period of time that Policy No. 200/658/76729 had been in force, then the premiums that would have been set for each and every one of the following years' renewals would definitely have been impacted. In the same manner, had Diaz disclosed either or both of the marine losses in which she and Gonzalez had been involved on any of the several renewal application documents which she and her brokers presented in order

28

to obtain these renewal policies, then the premiums that were set for both Policy No. OSPYP/111379 and OSPYP/120618 would definitely have been impacted. Any disclosure of a prior marine loss, no matter how minor, would have necessitated the application being presented to me for my own independent review and evaluation. I would have evaluated the application materials and on the basis of the increased risk made apparent by the fact that marine losses had been sustained during the first year's coverage, I would have required premiums for every one of the policies issued following the first policy set higher than the figure that was actually charged to Ms. Diaz for each of these renewals.

66.   Had Ms. Diaz disclosed the prior theft of the trailer and the vandalizing of the vessel at any time, I would have charged a higher premium for the policy of marine insurance, Policy No. OSPYP/120618, which was in effect at the time of the theft of the vessel which is alleged to have occurred on November 13, 2009, reflecting the risk due to the true marine loss history.

67.   Theft and vandalizing of vessels, trailers and all types of insured property is rampant throughout South Florida, and in every case, without exception any disclosure that there has been a prior theft or an incident such as Mr. Gonzalez described in his deposition, must necessarily cause us to be even more cautious and at the very least to charge a higher premium regardless of the type of vessel to be insured and regardless of whether the proposed vessel is to be kept at a marina or at the Assured's residence. Any prior loss activity always causes us to

charge a higher premium even in the event that we had been satisfied as to added security measures. In this case, where the very trailer which had been a subject of coverage for the very first year's policy has been stolen, I would have been absolutely compelled as a prudent and intelligent marine underwriter to have taken that fact into account when setting the premiums for each succeeding year's policy. I am not asserting that I would have refused to issue any policy at all. I am asserting that disclosure of these material facts would have caused me to have charged a higher premium as listed herein.

68. When any Quotation request or application comes into our facility for review, we have no ability to judge the nature of the risk being presented by any means other than the information disclosed therein. Accordingly, we rely completely on the compliance by the Assureds and brokers acting on their behalf with the admittedly onerous but critical obligations imposed by the principles of *uberimmae fidei* or "utmost good faith."

FURTHER YOUR AFFIANT SAYETH NAUGHT



B.A. USHER

Sworn before me this 13th day of April 2011

My commission expires: 10-15-2011

Notary Public State of Florida
Kay L Peck
My Commission DD715110
Expires 10/15/2011

Notary Public State of Florida
Kay L Peck
My Commission DD715110
Expires 10/15/2011